IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

RAY A. PARKER, and CAULETTE PARKER,
his wife,

                                   07cv0435

        Plaintiffs,                   **ELECTRONICALLY FILED**

   v.

VERIZON PENNSYLVANIA, INC.,
KIMBERLY K. ONESKO, and GEORGE
ONESKO

           Defendants.

**<u>Memorandum Opinion</u>**

## I.      Introduction

       This is an action for employment discrimination.  Plaintiff, Ray Parker (Parker), alleges

that defendant, Verizon Pennsylvania, Inc. (Verizon), discriminated and retaliated against him in

violation of Title I of the Americans with Disabilities Act (ADA) and the Family and Medical

Leave Act (FMLA) by terminating him for exercising his rights under the ADA and the FMLA.

Plaintiff[1] and his wife, Caulette Parker, also bring a state law claim of trespass against

defendants, Kimberly Onesko and George Onesko for allegedly entering upon plaintiffs' property

unlawfully and without consent on September 14, 2006.  Pending before this Court is defendants'

motion for summary judgment (doc. no. 26), with supporting documentation, and plaintiffs'

response in opposition thereto (doc. no. 36).  After careful consideration, and for the reasons that

follow, defendants' motion for summary judgment (doc. no. 26) will be GRANTED as to the

---

[1]For ease of reading, the Court will refer to allegations relating to only Ray Parker as
"plaintiff" and any allegations relating to the trespass claim, which was brought by both Ray and
Caulette Parker, will be referenced as "plaintiffs".

ADA and FMLA claims, and the remaining state law claim will be dismissed without prejudice.

## II.    Facts

The Court has assimilated approximately 99 pages of joint material facts submitted by the parties and has gleaned the following material facts.[2]

Plaintiff was hired by Verizon as a Customer Sales and Service Consultant (CSSC) in November, 2003, and following training at the Stanwix Street, Pittsburgh, location, he was assigned to Verizon's Robinson Township Call Center.

As a CSSC, plaintiff's primary job duty was to answer telephone calls from Verizon customers who had service or billing issues, and in addition to speaking on the telephone, he was required to enter information into a computer relating to the customer call. Plaintiff concedes that talking on the telephone was an essential part of the CSSC job.

In August 2004, plaintiff was diagnosed with Sarcoidosis, an autoimmune disease that causes inflammation of the lungs and he was also diagnosed with Pulmonary Fibrosis (formation of scar tissue in the lungs resulting in inability to exchange gases resulting in hypoxemia) by his treating physician, Dr. Gosai.[3]  As a result of plaintiff's diagnosis, he was required to treat with steroids, as well Methotrexate, a drug with potentially severe side effects including nausea and

---

[2]In a departure from the usual practice in the context of a motion for summary judgment (wherein the moving party sets forth its statement of undisputed material facts), plaintiffs submitted their own set of facts (doc. no. 35), to which the Court ordered defendants to respond with a JOINT statement of material facts (see doc. no. 39).  While the Court finds plaintiffs' statement of facts to be informative, many of these facts are not necessarily material to the instant dispute.  The Court has attempted to interject plaintiffs' statement of facts where appropriate and necessary.

[3]Plaintiff was also diagnosed with depression and treats with a psychiatrist, as well as taking Effexor for depression.  Defendant, however, was not aware of plaintiff's diagnosis of depression.

diarrhea.  Plaintiff also testified that although he had an oxygen tank available, he generally did not take the tank to work with him (except during his work at the Washington facility of Verizon).  R. Parker Deposition at 69-70.

From the time of his diagnosis, plaintiff testified that he was able to dress, shower while sitting down, cook, walk short distances (in fact his doctor recommended that he walk more), mow his lawn, shop, drive, garden, exercise, spend time with his wife, and engage, as a Jehovah's Witness, in door-to-door religious ministry on a monthly basis, which involved talking to people at their homes (plaintiff engaged in this activity for a total of 60-70 hours).

In August 2004, the same month plaintiff was diagnosed with Sarcoidosis, he began his first (of three) short-term disability leaves.  Following his first short term disability leave, in December 2004, he returned to the same job at the same number of hours and the same rate of pay.  A few days after returning from his first leave, plaintiff began another second short-term disability leave and returned to work in February, 2005.

Prior to plaintiff's return to work in February, 2005, plaintiff's primary care physician, Dr. Gosai, sent a letter to Verizon[4] recommending that: (1) plaintiff be permitted to work a shorter work week and work day; (2) that plaintiff be assigned work that does not involve talking on the telephone; (3) that plaintiff's commute be shortened; and (4) that plaintiff initially work three days per week with one day off in between each day.  Ms. Onesko spoke with plaintiff about the accommodations he requested.

Although defendant did not agree to plaintiff working with days off in between each day,

_____

[4]Met Life was responsible for administering disability benefits and/or physical restrictions of Verizon employees.

defendant did permit plaintiff to work a reduced schedule of fewer hours each day. Verizon also honored Dr. Gosai's recommendation that plaintiff have no external or internal customer contact.

Defendants contend that because customer contact was the primary duty of his CSSC job, defendants actually created a position for plaintiff by placing him an "off-line" position where no talking was required. Plaintiff disputes that contention and argues that because plaintiff was designated a medically restricted employee in accordance with Verizon's Mid-Atlantic Medically Restricted Policy he was placed in an off-line position. Regardless of the characterization of whether a job was actually created for plaintiff, defendants did accommodate plaintiff by accepting Dr. Gosai's recommendation that plaintiff be assigned to work that did not involve talking on the telephone.

As to plaintiff's request that he be transferred to Verizon's Greensburg or Uniontown facilities because he wanted a less stressful commute, defendants did not agree to that accommodation because it deemed that request as not relating to his ability to perform his job with Verizon.

In the spring of 2005, while plaintiff was performing the off-line position, he requested a transfer to a less physically demanding job, despite the fact that he also testified that the off-line position was not physically demanding. R. Parker Depo. at 108-109.

In May 2005, Call Center Manager Joyce Adams told plaintiff and other employees with medical restrictions that positions in the Greensburg office would be available for those with restrictions that still allowed customer contact, but no sales. Plaintiff then contacted Dr. Gosai, who eventually changed plaintiff's restrictions to allow customer contact with no sales. Plaintiff testified that the reason for this change was based upon his medical condition stabilizing slightly

4

during this time.

In December 2005, plaintiff began his third leave of absence and returned to work in February 2006, with restrictions of no talking on the telephone or customer contact. Following his return, based upon space issues at the Robinson facility, plaintiff, along with the entire off-line group, were transferred to Verizon's Washington, Pennsylvania facility, which was closer to plaintiff's home. Although the off-line position in Washington was the same number of hours as the CSSC, plaintiff's position went from having flexible start and end times, to a fixed start and end time. Plaintiff testified that he could not "think of any" instance where Verizon personnel refused to discuss any reasonable accommodations. R. Parker Depo. At 230-231.

Beginning in July or August 2006, plaintiffs decided to purchase a ranch style modular home because plaintiff was allegedly having difficulty climbing stairs in the former residence. While the home was being built, plaintiffs were residing with their aunt, approximately three blocks from the "construction site" where the new residence was being built.

On September 14, 2006, plaintiff called off work at approximately 7:45 a.m. by leaving a message for Susan Nelson, a Verizon Absence Administrator, stating: "I was taking an FMLA day today, that I wasn't feeling well." R. Parker Depo. at 148-149.

Plaintiff testified that on September 14, 2006, because he had taken the Methotrexate the night before, he "felt real nauseous" and had had "diarrhea throughout the night." R. Parker Depo at 149. Nonetheless, plaintiff left his aunt's home and went to the construction site of the new home, although plaintiff testified that he did normally go to the new home when he was feeling sick.

On September 14, 2006, plaintiff Caulette Parker had taken a half-day of work, and

several construction workers as well as Caulette Parker's father were scheduled to be working at the construction site that day.

Plaintiff met the workers at the construction site and testified that he then went back to the bedroom and laid down on an inflatable mattress until his father-in-law arrived. R Parker Depo at 158. Plaintiff's father-in-law arrived at the construction site at 9:30-10:00 a.m. to build a set of stairs. Plaintiff testified that he walked up and down a set of 15 stairs a couple of times during the day. While plaintiff was in the basement, his father-in-law used an electric saw to construct the stairs. Plaintiff's father-in-law left the construction site at approximately 3:00 p.m.

Plaintiff did not call or go to the doctor's office on September 14, 2006.

Meanwhile, on the morning of September 14, 2006, Andrew Roberts, the husband of plaintiff's then manager, Debra Roberts, called his wife at Verizon and told her that he had seen plaintiff unloading something at the construction site. Plaintiff denies that he helped move materials or that he performed work on his new home. Nonetheless, Ms. Roberts then called Absence Administrator Susan Nelson and told Ms. Nelson that Mr. Roberts had seen plaintiff unloading what appeared to be shingles from a white van. After speaking with Kimberly Onesko, another Absence Administrator, hours later, Ms. Roberts also emailed Ms. Nelson and stated as follows:

> On the day of 09-14-06 my husband Andrew Roberts was visiting his cousin that lives [sic] the Hiller area, which is nearby the house that Ray Parker is building. My husband saw Ray and a few other men unloading a white van that looked like it contained shingles then when my husband spoke with me he let me know he saw ray doing work at his new house which by the way he doesn't live there. Ray had advised me before he couldn't move in until the township had approved occupancy because the foundation needed to be finished. Ray is staying with in-laws just a few streets over from his new house. So after speaking with my Husband I called Suzy Nelson and advised

her of the situation because Ray wasn't at work.

Susan Nelson Depo., Exhibit 9.

Ms. Onesko and Ms. Nelson agreed that a home visit should be conducted, and Ms. Onesko would do the home visit because she was more familiar with the area. Ms. Onesko left the Robinson Township Call Center at approximately noon and drove by the construction site, but she did not see plaintiff. Ms. Onesko then returned to her home to get a camera and asked her husband, George Onesko, who was not a Verizon employee, to accompany her on the home visit. The Oneskos returned to the construction site, which was marked with no trespassing signs, and observed plaintiff inside the garage. After conferring with Verizon Labor Relations Manager Cindy Marinari, Ms. Onesko decided to approach plaintiff. At approximately 5:30p.m., Ms. Onesko walked on the driveway to the Parkers' garage door, which was open. Ms. Onesko prepared notes of her home visit and her typed memorandum stated, in relevant part:

> I approached the open garage door area - heard an electric saw being used in the basement area. I called out Ray's name, remaining outside the garage. Ray entered the garage from the basement area. Ray was perspiring and wiping his hands on a rag. At this point the saw stopped running.

Onesko Depo., Exhibit 18.

Plaintiff entered the garage from the basement of the house, and Ms. Onesko told plaintiff that if he was feeling better, he was required to report to work. Plaintiff responded that he was "starting to feel better, but [he] was not feeling well enough to go into work." R. Parker Depo. at 195. During this conversation, plaintiff Caulette Parker also entered the construction site to find her driveway at least partially blocked by the Oneskos' van. Mr. Onesko did not get out of the van during the conversation between plaintiff and Ms. Onesko. Plaintiffs never asked either of

the Oneskos to leave the property.  In fact, plaintiffs engaged in discussion with Ms. Onesko while she was on the property.  The Oneskos caused no physical damage to the property. Plaintiff also believes that Mr. Onesko was on his property earlier in the day on September 14, 2006 allegedly to take photographs of plaintiff, but admits that Mr. Onesko was only on the property for one to two minutes, that plaintiff spoke to Mr. Onesko, that Mr. Onesko did no harm to the property and that plaintiff did not ask Mr. Onesko to leave.  R. Parker Depo. at 181-183.

On September 15, 2006, plaintiff was suspended from his employment at Verizon pending further investigation of potential falsification of his medical condition.  During the investigation, Ms. Nelson and Verizon Call Center Manager Rori Broggi[5] reviewed information that was provided by Ms. Onesko, which provided:

> 9-14-06
> Investigation - Absence of Ray Parker on 9-14-06
> Ray Parker has an NCS date of 11-17-2003.  He has been medically restricted or on disability since 7-2004.  His current work location is 41 E. Beau St. Washington Pa.  He is part of the group of medically restricted consultants.  He works a 10:30 to 7 tour.   The home visit today was prompted by information provided by Deborah Roberts - temp management in Washington, PA.  She advised that Ray was seen this morning at his home under construction helping to unload what appeared to be sheets of material from a white truck.
> - Approximately 1:30 p.m. - visual observance of Ray's dark grey Mitsubishi parked outside the home he is building on the 3rd St. In Hiller Pa.
> - Approximately 3:00 - car still parked outside the home.
> - Approximately 5:00 - saw Ray Parker and a ladder - just inside the garage door opening (there are no doors installed) where the electrical service box is located.
> - 5:25 p.m. - I approached the open garage door area - heard an electric saw being used in the basement area.  I called out Ray's name, remaining outside the garage.  Ray entered the garage from the basement area.  Ray was perspiring and wiping his hands on a rag.  At this point the saw stopped running.  I told Ray I was aware he had reported off sick using his FMLA

[5]Ms. Broggi manages 300 associates and 13 management supervisors that work at the Verzon Robinson Township facility answering incoming calls from Verizon Customers.

8

certification this morning, and asked him to explain how his absence for his precertified illness related to his performance of construction work on his new home. Ray said he had been sick that morning. At this point his wife entered the garage area from the street. She added that he had diarrhea in the morning. I told Ray that since he was no longer ill, he would be expected to report to work for the remainder of his tour. Verizon's expectation is that when you are too ill to work, you should remain at home, but once you are well, you would report to work. Ray asked what he should do and I advised him it was his decision but that he could choose to report to his work location for the balance of his tour. I also advised Ray that at this point he would not be paid for today's absence, and an investigation will ensue. Ray asked what would happen - I told him this would be investigated under the Code of Conduct. His wife said that he would be contacting the union; she also said Verizon, and me in particular, had been rude to her husband, as well as his doctor's office. She explained this was in reference to a conversation in the past between me and a nurse at his dr. office concerning the wording of his medical restriction. At that point I told Ray that I had nothing further to add today, and I departed.

I have also attached 7 photographs taken at the site today.
Kim Onesko - Absence Administrator

Nelson Depo. at 74-75; K. Onesko Depo. Exhibit 18.

Although plaintiff admits that Ms. Onesko wrote the above information, plaintiff denies that he performed any work on his new house on September 14, 2006.

Based upon the collective decision of management employees, Susan Nelson, Cindy Marinari, Rori Broggi, and Michael Billups, on September 26, 2006, plaintiff was discharged from Verizon on the basis that he misrepresented his health condition in violation of Verizon's Code of Business Conduct. Plaintiff's Discharge Notice stated that he was being discharged for violating the following provision from Verizon's Code of Business Conduct:

3.3.1 Company Benefits
Verizon's benefits plans and programs are provided as compensation and must be used honestly. You must not misrepresent your health status, your covered members, your beneficiaries, or any other facts, including reasons for absence, in order to claim benefits to which you, or someone else, are entitled.

R. Broggi Depo, Exhibit 18.

In addition to disputing the reason for the discharge, plaintiff testified that Verizon Manager Ms. Broggi yelled at plaintiff in front of his co-workers when she learned that he had restrictions that prevented him from working on the telephone in February 2006 and allegedly tried to force him to resign. Plaintiff also testified that he was denied a scheduled pay raise and was forced to file a grievance in order to receive his pay raise. Plaintiff further contends that the email sent by Ms. Onesko (a non-decision maker) to other decision-makers at Verizon, that Ms. Onesko stated that "I really hate to send him to the Washington office, because he lives in Bentleyville," supports his claim. Doc. No. 35-9, K. Onesko Depo., at 60-67 and Exhibit 13.

## III.    Standards of Review

Summary judgment under Fed.R.Civ.P. 56(c) is appropriate "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Woodside v. School Dist. of Philadelphia Bd. of Educ.*, 248 F.3d 129, 130 (3d Cir. 2001), *quoting Foehl v. United States*, 238 F.3d 474, 477 (3d Cir.2001) (citations omitted). In deciding a summary judgment motion, the court must "view the evidence ... through the prism of the substantive evidentiary burden" to determine "whether a jury could reasonably find either that the plaintiff proved his case by the quality and quantity of the evidence required by the governing law or that he did not." *Anderson v. Consolidated Rail Corp.*, 297 F.3d 242, 247 (3d Cir. 2002), *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).

When the non-moving party will bear the burden of proof at trial, the moving party's burden can be "discharged by 'showing' -- that is, pointing out to the District Court -- that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party has carried this burden, the burden shifts to the non-moving party who cannot rest on the allegations of the pleadings and must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1230 (3d Cir. 1993). Thus the non-moving party cannot rest on the pleadings, but instead must go beyond the pleadings and present "specific facts showing that there is a genuine issue for trial," Fed.R.Civ.P. 56(e), and cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir.1989) (*citing Celotex*, 477 U.S. at 325 (1986)). The non-moving party must respond "by pointing to sufficient cognizable evidence to create material issues of fact concerning every element as to which the non-moving party will bear the burden of proof at trial." *Simpson v. Kay Jewelers, Div. Of Sterling, Inc.*, 142 F. 3d 639, 643 n. 3 (3d Cir. 1998), *quoting Fuentes v. Perskie*, 32 F.3d 759, 762 n. 1 (3d Cir. 1994).

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.' *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)." *Marino v. Industrial Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004.) *See also Doe v. County of Centre, PA*, 242 F.3d 437, 446 (3d Cir. 2001) (court must view facts in the light most favorable, draw all reasonable inferences, and resolve all

doubts, in favor of the nonmoving party ).

**IV.    Discussion**

In analyzing claims for discrimination and retaliation under the ADA and the FMLA, we apply the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under this scheme: (1) plaintiff bears the burden of establishing a prima facie case of discrimination; (2) the burden of production then shifts to defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action; and (3) if defendant meets its burden of production, plaintiff must prove by a preponderance of the evidence that defendant's proffered reason was a pretext for discrimination.  *See McDonnell Douglas*, 411 U.S. at 802; *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-508 (1993).

**A.    ADA**

**(1) Prima Facie Case**

In order to establish that Verizon has violated the ADA, and therefore, engaged in disability discrimination, plaintiff must show that: (1) he is disabled within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodation; and (3) he has suffered an adverse employment action as a result of discrimination.  *See Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999); *Deane v. Pocono Med. Ctr.*, 142 F.3d 138, 142 (3d Cir. 1998).

"Disability" is defined as (a) a physical/mental impairment that substantially limits one or more of the major life activities of such individual; (b) a record of such impairment; or (c) being regarded as having such an impairment.   42 U.S.C. § 12102(2).  The "regarded as" provision means either (1) a covered entity mistakenly believes that a person has an impairment that

substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, non-limiting impairment substantially limits one or more major life activities. *See Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999).

Merely having an impairment does not make a person disabled under the ADA. *Toyota Motor Mfg, KY. Inc. v. Williams*, 534 U.S. 184 (2002). Plaintiff also must demonstrate that the impairment limits a major life activity. *Id.* A major life activity is "substantially limited" if (1) the impairment renders the individual unable to perform a major life activity that the average person in the general population can perform; or (2) the individual is significantly restricted as to the condition, manner, or duration under which the individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. 29 C.F.R. § 1630.2(j)(1)(i)-(ii); *Endres v. Techneglas, Inc.* 139 F.Supp.2d 624, 625 (M.D. Pa. 2001).

Major life activities are "those activities that are of central importance to daily life." *Toyota Motor Mfg, KY. Inc. v. Williams*, 534 U.S. 184 (2002). Major life activities include: caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, working, sitting, standing, lifting and reaching. *Kralik v. Durbin*, 130 F.3d 76, 78-79 (3d Cir. 1997).

**(a) Plaintiff has arguably shown that he is disabled within the meaning of the ADA.**

Plaintiff claims that he suffers from two disabilities: Sarcoidosis and Depression, and that he is substantially limited in the major life activities of breathing, talking, walking and thinking, thus rendering him disabled under the ADA definition.

As to plaintiff's claim that he is substantially limited in the major life activity of talking,

13

plaintiff testified that "whenever I talk a lot, I get winded, I'm not able to talk constantly because of the damage to my lungs." R. Parker Deposition at 27. Plaintiff's treating physician also stated in his report that plaintiff's Sarcoidosis and Pulmonary Fibrosis affect the ability of the lungs to exchange gases. However, there is no dispute that plaintiff testified that following his diagnosis, he, as a Jehovah's Witness, has spent between 60 to 70 hours going to homes in the community to talk to people about religion. Also, as defendants point out, plaintiff spoke for approximately six hours during his deposition, and plaintiff currently works as a Customer Services Representative for Teletech, where he talks on the telephone regularly and requires no accommodation to do so. Doc. No. 39, Joint Statement of Facts at ¶ 76.

In *Walker v. Independence Blue Cross*, 2005 WL 1266590, at *5 (E.D. Pa. May 27, 2005), the Court held that an employee's inability to talk on the phone for long periods of time at work "is actually a claim of impairment in the major life activity of working" not of talking. Accordingly, under *Walker*, plaintiff's claim that he is substantially limited in the major life activity of talking is actually more akin to an alleged substantial limitation in the major life activity of working. Plaintiff has neither claimed nor established that he is substantially limited in the major life activity of working.

Keeping in mind that the threshold to be considered disabled under the ADA is a high standard, *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 197 (2002), plaintiff has failed to set forth any evidence, other than the report of his treating physician, to support his contention that he is "substantially limited" in the major life activities of breathing, walking and thinking. However, when viewing the facts in the light most favorable to plaintiff, through his diagnosis, the report of his physician, and his testimony, plaintiff has at least arguably created an

14

issue of fact to demonstrate that his impairments (as to his breathing) render him "significantly restricted as to the condition, manner, or duration under which [he] can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1)(i)-(ii); *Endres v. Techneglas, Inc.* 139 F.Supp.2d 624, 625 (M.D. Pa. 2001).[6]

Accordingly, for purposes of summary judgment, plaintiff has presented sufficient evidence to create a material issue of fact regarding whether he is disabled under the ADA.

### (b) Plaintiff has arguably shown that he is otherwise qualified to perform the essential functions of the job.

Next, in order to make out a prima facie case of discrimination under the ADA, plaintiff must show that he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodation. *See Taylor v. Phoenixville Sch. Dist.*, 184 F.3d at 306.

Plaintiff was otherwise qualified to perform the essential functions of the job, at least with reasonable accommodations. With the reasonable accommodations which were afforded by Verizon, plaintiff was able to perform an "off-line" position, but he was unable to perform the every essential function of the job of CSSC. In fact, Verizon tailored the requirements of the job and changed plaintiff's job to an "off-line" capacity just to accommodate plaintiff's alleged inability to talk for long periods of time. Although the Court is not convinced that plaintiff has shown that he was able to perform all of the essential functions of the job of CSSC, for purposes of summary judgment, the Court will resolve the dispute in plaintiff's favor and assume that

---

[6]Having resolved the determination of plaintiff's alleged disability under the ADA in favor of plaintiff for summary judgment purposes, the Court need not address plaintiff's alternative argument that he was "regarded as" disabled by Verizon.

plaintiff was able to perform the essential functions of the job *with* accommodations.

**(c) Plaintiff has *not* shown that he has suffered an adverse employment action as a result of discrimination.**

Plaintiff has presented no evidence to create a material issue of fact that he suffered an adverse employment action as a result of discrimination. An adverse employment decision includes an employer's failure to accommodate, reasonably, the employee's disability. *Turner v. Hershey Chocolate U.S.A.,* 440 F.3d 604, 611 (3d Cir. 2006). An employer also has a duty to engage, in good faith, in the "interactive process," with the employee. *Reifer v. Colonial Intermediate Unit 20,* 462 F.Supp.2d 621 (M.D. Pa. 2006)(citations omitted).

As stated above, the evidence presented demonstrates that based upon the letter from plaintiff's treating physician, Dr. Gosai, Verizon made several accommodations to plaintiff's schedule and manner of work. Plaintiff has presented no evidence to show that defendant failed to engage in "the interactive process." In fact, the evidence of the accommodations afforded to plaintiff supports the contrary.

The only credible evidence plaintiff presents to support his claim that he suffered an adverse employment action as a result of discrimination is one alleged comment by Ms. Onesko that she "hated" to transfer defendant to an office closer to his home (plaintiff was indeed transferred to the Washington office), and one alleged exchange between Ms. Broggi and plaintiff (which occurred several months before his termination) wherein she allegedly yelled at him. However, a stray remark made by a non-decision maker made during a time period which is not proximally related to defendant's termination, does not bolster his case. *Gomez v. Allegheny Health Serv., Inc.* 71 F.3d 1079, 1085 (3d Cir. 1995)("[S]tray remarks by non-decision makers ...

16

are inadequate to support an inference of discrimination by the employer.") *See also, Ezold v. Wolf, Block, Shorr & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992)("Stray remarks by non-decision-makers or by decision-makers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision.").

For these reasons, plaintiff can not establish the third essential element of a prima facie case under the ADA - - that he suffered an adverse employment action as a result of his disability. *See Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999).

**(2)    Verizon's legitimate non-discriminatory reason for plaintiff's discharge**

As to the second prong of the *McDonnell Douglas* standard, the burden then shifts to Verizon to produce evidence that the plaintiff was terminated for a legitimate nondiscriminatory reason. *See Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994)(citing *McDonnell Douglas*, 411 U.S. at 802). Given the fact that plaintiff claimed FMLA benefits on the day the investigation ensued and the investigation allegedly revealed that plaintiff was actually working on his new home, the Court finds that Verizon easily met its burden to demonstrate a legitimate non-discriminatory reason for plaintiff's termination - - that is, for violating Verizon's Code of Business Conduct by "misrepresent[ing] [his] health status." Broggi Depo., Exhibit 18. *See*, *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 254 (1981)("defendant need not persuade the court that it was actually motivated by the proffered reasons").

**(3)    Plaintiff has not shown pretext**

Finally, under the final prong of the *McDonnell Douglas* analysis, the burden shifts to plaintiff to produce sufficient evidence to withstand summary judgment on the issue of pretext.

17

*See McDonnell Douglas*, 411 U.S. at 802.  Plaintiff must point to some evidence, direct or circumstantial, from which a fact-finder could reasonably either (1) disbelieve defendant's articulated legitimate reasons or (2) believe than an invidious discriminatory reason was more likely than not a motivating or determinative cause of defendant's action.  *See Fuentes*, 32 F.3d at 764; *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 523 (3d Cir. 1992)(citation omitted).  In other words, plaintiff must demonstrate such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in defendant's proffered legitimate reasons such that a "reasonable fact-finder could rationally find them unworthy of credence and hence infer that the proffered nondiscriminatory reasons did not actually motivate" defendant's action. *Fuentes*, 32 F.3d at 764-765 (quoting *Ezold*, 983 F.2d at 531).  Another way to establish that discrimination was more likely than not a cause of the employer's action is to show that the employer has treated more favorably similarly situated persons without the protected class. *Simpson v. Kay Jewelers, Div. Of Sterling, Inc.*, 142 F.3d 639, 645 (3d Cir. 1998)(citing *Fuentes*, 32 F.3d at 765).

Simply put, plaintiff has presented no evidence from which a rational fact finder could infer that his termination was a pretext for discrimination, or that he suffered any other adverse employment action as a result of his alleged disability.  He again fails to establish any inconsistencies or contradictions in Verizon's proffered reason for his termination, and he does not claim that other similarly situated persons not within the protected class were treated more favorably.  As stated above, one stray remark of "frustration" with plaintiff's transfer to the Washington office is not sufficient evidence to demonstrate pretext.  K. Onesko Depo. 62-65, Exhibit 13.  *Gomez,* 71 F.3d at1085.

In *Shaner v. Synthes*, 204 F.3d 494 (3d Cir. 2000), the United States Court of Appeals for the Third Circuit affirmed the dismissal of an ADA claim of a plaintiff with multiple sclerosis (MS) and explained that plaintiff's evidence that the employer denied him training, gave him poor performance evaluations, relocated his office, requested that he attend counseling, and terminated him, was insufficient to rebut the employer's articulated reason for the discharge. The Court stated that: "Contrary to the interference which Shaner seeks to raise, the evidence shows that the company made substantial efforts to accommodate him. When Shaner returned from his first leave of absence in 1994, the company lightened his month-end work load and allowed him to attend water therapy sessions during work hours." 204 F.3d at 507.

Likewise, the facts in this case illustrate that Verizon provided plaintiff with requested time off, agreed to a reduced work hours arrangement, placed him in the "off-line" position, and maintained his hours, benefits and rate of pay throughout his entire employment.

The evidence further demonstrates that several managerial employees (specifically Susan Nelson, Cindy Marinari, Rori Broggi, and Michael Billups) made the decision to terminate plaintiff. Doc. No. 39, Joint Statement of Facts at ¶ 73. Although plaintiff would have this Court infer that several members of the Verizon management team were engaged in a conspiracy to discriminate against him based upon his alleged disability, plaintiff's real argument boils down to his own disagreement with the soundness of Verizon's decision to terminate plaintiff based on what Ms. Onesko allegedly witnessed during the September 14, 2006 home visit. However, in the absence of evidence indicating that the decision makers acted with improper motives, this Court will not act as a "super-personnel department." *Brewer v. Quaker State Oil Refining Co.*, 72 F.3d 326, 332 (3d Cir. 1995).

Viewing the facts in the light most favorable to plaintiff, this Court finds that he has failed to establish sufficient evidence from which a reasonable fact-finder could rationally find that Verizon's articulated reasons for its employment action were unworthy of credence, or that the decision to terminate him was the result of any discriminatory motive. Where a plaintiff is unable to show weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in defendant's reasons for its action, summary judgment is required. *See Fuentes*, 32 F.3d at 756.

### B.    Retaliation

To establish a prima facie case of retaliation, plaintiff must demonstrate that: "(1) he engaged in protected activity protected; (2) the employer took an adverse employment action against him; (3) there was a causal connection between his participation in the protected activity and the adverse employment action." *Moore v. City of Philadelphia, et al.*, — F.3d — , 2006 WL 2492256 (3d Cir. 2006)(quoting *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)). *See Sabbrese v. Lowe's Home Centers, Inc.,* 320 F.Supp. 2d 31,, 320-23 (W.D. Pa. 2004)(noting that causal link in retaliation cases is typically established by evidence of timing and/or ongoing antagonism).

Plaintiff has failed to demonstrate a causal connection between his participation in the protected activity (using his FMLA leave) and his termination. In fact, as stated above, there is no dispute that defendant had been accommodating plaintiff's alleged disabilities for approximately two years prior to his termination. Verizon's stated reason for plaintiff's termination was misrepresentation of his health status and plaintiff has failed to point to any credible evidence that exercise of his FMLA rights had any casual connection whatsoever to his discharge. Therefore, plaintiff's claim for retaliation must fail.

## C. __FMLA Interference__

To establish an FMLA interference claim, plaintiff must only show that he was entitled to benefits under the FMLA, and that the employer interfered with them. *Callison v. City of Philadelphia*, 430 F.3d 117, 119 (3d Cir. 2005). Although Verizon disputes that plaintiff was eligible for FMLA benefits because he had not been employed for 1250 hours of service as of September 14, 2006, plaintiff counters that he met the 1250 hour eligibility requirement when he was certified for "intermittent" leave effective March 8, 2006 (which was later amended effective April 27, 2006). The FMLA provides that in certain circumstances, leave may be taken intermittently. 29 U.S.C. § 2612(b)(1).

Plaintiff cites *Barron v. Runyan*, 11 F. Supp. 676 (E.D. Va. 1998), in support of his position that an employee who seeks intermittent FMLA is only required to establish his eligibility for the first absence related to that leave, and was not required to re-establish eligibility for each subsequent absence taken for the same reason during the following 12 months. *Id.* at 679-683. In reaching this decision, the district court noted that adopting the employer's argument would render intermittent leave meaningless. *Id.*

This Court agrees with the analysis set forth by the Court in *Runyan* and therefore finds that plaintiff was eligible for benefits under the FMLA. That said, this Court does not find that Verizon in any way interfered with plaintiff's exercise of his benefits under the FMLA. To the contrary, the Court finds that Verizon was more than reasonable in its accommodation of plaintiff's conditions. Plaintiff's claim for FMLA interference necessarily fails.

### D.     **State Law Trespass**

Plaintiffs' remaining claim against individual defendants Kimberly and George Onesko is that they entered onto plaintiffs' land without consent or authority and against their will.

Pennsylvania law defines trespass to land as "an unprivileged, intention intrusion upon land in possession of another." *Kopka v. Bell Telephone Co.*, 91 A.2d 232, 235 (Pa. 1952). However, the consent of a person in possession of the property to entry upon the premises is a complete defense to a trespass action. *LAL v. CBS, Inc.*, 726 F.2d 97, 100 (3d Cir. 1984).

Defendants argue that because plaintiffs both conversed with Ms. Onesko while she was on their property, and neither asked them to leave the property (Statement of Facts at ¶ 67), plaintiffs, therefore, impliedly consented to the Onesko's entry upon their property.  Plaintiffs counter that defendants failed to heed their no trespassing signs and blocked their driveway with their car.

Having declined to rule in favor of plaintiff on the federal question claims over which this Court had original jurisdiction, the final issue before this Court is whether the Court should hear the remaining state law claim for trespass.

In *Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995), the United States Court of Appeals for the Third Circuit, citing *United Mine Workers v. Gibbs,* 383 U.S. 715, 726 (1966), set forth the following analysis, which this Court finds to be instructive:

> Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well. Similarly, if it appears that the state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought, the state claims may be dismissed without prejudice and left for resolution to state tribunals.

Even after the pretrial process has been completed and trial commenced, recognition of a federal court's wide latitude to decide ancillary questions of state law does not imply that it must tolerate a litigant's effort to impose upon it what is in effect only a state law case. Once it appears that a state claim constitutes the real body of a case, to which the federal claim is only an appendage, the state claim may fairly be dismissed.

Under *Gibbs* jurisprudence, where the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so.

383 U.S. at 726. (internal citations omitted).

After careful consideration, having dismissed plaintiffs' discrimination and retaliation claims against Verizon, the Court will decline to decide the pendent state law trespass claim lodged against the Oneskos. Accordingly, plaintiffs' state law trespass claim will be dismissed, without prejudice.

## V. Conclusion

For the reasons set forth hereinabove, defendants' motion for summary judgment (doc. no. 26) will be GRANTED as to plaintiff's claims for discrimination and retaliation under the ADA and the FMLA. The Court will not rule on defendants' motion for summary judgment as to plaintiffs' claim for trespass, but will dismiss said claim without prejudice to plaintiffs' refiling a trespass action in state court. An appropriate order follows.

s/Arthur J. Schwab          
Arthur J. Schwab
United States District Judge

cc:     All counsel of record